## COMMONWEALTH *vs.* FELICIA BROWN.

No. 99-P-1970.

Suffolk. June 13, 2001. - July 16, 2002.

Present: ARMSTRONG, C.J., GRASSO, & BERRY, JJ.

*Perjury. Grand Jury. Evidence,* Testimony before grand jury. *Practice, Criminal,* Grand jury proceedings, Conduct of prosecutor, Stipulation.

The Commonwealth was not required to advise a grand jury witness of her right to counsel or of her privilege against self-incrimination, where the witness was not a target of the criminal investigation at the time of her testimony; therefore, the witness, who was later indicted for perjury before the grand jury, was not entitled to dismissal of the indictment based on the Commonwealth's failure to so advise her. [444-446]

A Superior Court judge properly denied a motion to dismiss, for insufficient evidence, an indictment charging perjury before the grand jury, where the evidence was sufficient to meet the probable cause standard to arrest, in that the defendant's testimony, which was filled with internal inconsistencies and strong improbabilities, was itself evidence that she was lying, and thereby corroborated the testimony of another witness. [446-447]

At the jury-waived trial of an indictment charging perjury before the grand jury, the stipulation of facts to which the defendant agreed was tantamount to a guilty plea, and the defendant was therefore entitled to the same safeguards that surround the acceptance of a guilty plea; because the jury waiver colloquy that the defendant received did not contain critical elements that must be included in a guilty plea colloquy, this court reversed the judgement of conviction and set the verdict aside. [447-449]

INDICTMENT found and returned in the Superior Court Department on March 25, 1997.

Motions to dismiss were heard by *Thomas E. Connolly*, J., and the case was heard by *Elizabeth B. Donovan*, J.

*Joseph Terranova* for the defendant.

*Joseph M. Ditkoff*, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, C.J. The defendant, Felicia Brown, appeals from a conviction of perjury based on testimony she gave to a grand

jury investigating the shooting of her cousin, Christopher Robinson. Robinson had been looking after Felicia's mother's house while the mother was away, and it was at the house that the shooting occurred in the early morning hours of August 16, 1996. Before he was taken to the hospital, Robinson told police that his assailant was Felicia's boyfriend, Melvin; he didn't know Melvin's last name. At the hospital he was intubated and remained in critical condition for an extended period, unable to supply further details.

On August 27, by arrangement with Felicia's mother (Felicia was then seventeen), police officers were able to interview Felicia, who told them that she and Melvin (his last name was Smith) had been at the apartment the evening of August 15 but had left sometime after midnight — she did not know just when. They had returned to the apartment house just before the shooting. Melvin, Felicia said, had just parked their car, and he remained in it while she started to enter the house. At that moment gunshots rang out, and she, instead of investigating what had happened, ran back to the car, jumped in, and Melvin drove away. From an apartment outside, she made a telephone call back to the house and was told by Romanis Charles, her stepfather, that Robinson had been shot. She put the police in touch with Melvin by calling his pager number, and when he called back he confirmed that he and Felicia had heard the gunshots on the street outside the apartment house and had driven away.

On August 30, based on Robinson's statement in the immediate aftermath of the shooting, the police arrested Melvin Smith. Robinson, although still intubated, was able by September 9 to point out Melvin Smith in a photo array as the person who shot him.[1] On September 11, Felicia appeared before a grand jury considering the evidence against Melvin Smith. Her testimony that day was the basis of the perjury indictment.

The testimony ran thus. On the evening of August 15, she and Melvin, having been at a "family day" function at the Bromley-Heath housing project, had returned to the house where

---

[1]Further attempts to interrogate Robinson, who was thought at that time to have only a ten to twenty percent chance of surviving, were halted by medical personnel.

she lived with her mother, her stepfather, and two siblings who were away at camp. The stepfather was in his third-floor bedroom. Felicia and Melvin were in her second-floor bedroom. Christopher Robinson, who had been asked by Felicia's mother to mind the house while she was visiting relatives in Alabama, was drunk and was upset about something — Felicia did not know what. He started breaking things. He smashed a vase or two, ripped a phone cord from the wall, and used a lock swinging from a chain he carried to smash a hole in the wall. Sometime, probably around midnight — Felicia could not pinpoint the time because she did not have a watch — she and Melvin left the house intending to call her mother to tell her what Chris was doing to her house. They drove off in Melvin's Honda when she realized she did not have her book of telephone numbers with her. They did not go directly back to the house, but instead drove to Jamaica Pond, where they sat for a time discussing what to do and what was wrong with Chris. Felicia was very upset. After about one-half hour or so, they drove back to the house. She left the car and was starting to unlock the entrance door when shots rang out. Afraid, she ran back to Melvin in the car, got in, and they drove off. She wanted to get to a telephone to let her mother know what was going on. Melvin drove to his friend Tony's house near Warren Gardens, thinking he had a telephone. Because he did not, they went to the house of one of Tony's neighbors and called from there. She called her mother in Alabama. Her mother was not there; instead, Chris's sister answered. Felicia told her something was going on in the house, she was not sure what, but there were shots. Felicia did not tell her that Chris had been shot. When Felicia called back to the house, she learned from her stepfather that Chris had been shot and that an ambulance was coming to take him to the hospital. That was why she did not call the police.

The assistant district attorney questioned Felicia during her testimony. How did she get the number in Alabama? From her stepfather; she called him before she called Alabama. Had she and Melvin not driven past Melvin's own apartment to get to Warren Gardens? She did not know; she had been too upset to notice. Was Melvin's apartment not around the corner from her

own house? Did Melvin have a telephone? Yes and yes. Did they not pass the branch police station to get to Warren Gardens? She did not know. What was Tony's last name? She did not know; she had been there only twice before. She did not know the name of the woman from whose apartment she made the phone call. If she were told that the call to the police station reporting the shooting came in at 3:54 A.M., would that refresh her recollection as to the time she and Melvin arrived back at the house? Maybe she and Melvin had stayed at Jamaica Pond longer than she thought. Why did Melvin stay in the car? Because she was only going inside briefly to get her mother's number and make the phone call. At four in the morning? No. Yes. She was not sure if it was four in the morning. Melvin and Chris had a good relationship; they never argued. She could not explain why Chris said Melvin shot him, if he really said that. The night after the shooting she stayed in a friend's house; thereafter, she went back to her own house. Melvin stayed with her for several nights because she was afraid. She had never seen Melvin with a gun. She asked her stepfather for her mother's number in Alabama because she knew they had talked earlier in the evening. She thought maybe the police had found where her mother was staying. Her mother was not staying with Chris's sister in Tuscaloosa but in Birmingham. She had tried to contact her mother first, but there was no number at which Felicia could have contacted her, so she called her stepfather and got the number. Felicia's testimony ended on that inconclusive note.

Despite Felicia's testimony — presumably on the basis of Robinson's statement to police the night of the shooting — the grand jury on September 26, 1996, returned indictments against Melvin, charging him with armed assault with intent to murder and assault and battery with a dangerous weapon. He was later charged also with illegal possession of a firearm, fourth offense, based on his possession of the revolver used in the shooting.

A second grand jury was convened on February 4, 1997, to consider Felicia's role in the events of the shooting based on evidence that had developed after her grand jury appearance on September 11, 1996. The grand jurors had before them a videotaped deposition of Robinson, taken at the hospital on

October 15, 1996, in which he testified, using an alphabet board and gestures, that it was Melvin who had shot him in his bedroom the night of August 16, that Felicia had been in the room with Melvin when Melvin had shot him, and that Felicia and Melvin had fled together. The grand jury had the transcript of Felicia's testimony before the first grand jury. They also heard testimony from two investigating officers, including evidence from telephone records that the collect call from Felicia to Robinson's sister's house in Tuscaloosa was placed from a telephone in Melvin's friend Tony's apartment at 6:14 A.M., almost two and one-half hours after the shooting. They also heard evidence that Felicia had told Robinson's sister in that conversation that Robinson had been shot. A neighbor of the Browns had told police that she had been awake the night of the shooting nursing an infant and that, shortly after three shots rang out, she heard *two* car doors slam and a car hurry away.

The second grand jury returned two indictments against Felicia, one for being an accessory after the fact to Melvin's armed assault with intent to murder, and the second for perjury in her testimony before the first grand jury. The indictments were severed for trial, and Felicia, in a joint trial with Melvin, was acquitted on the accessory charge on November 16, 1998. (Melvin was convicted on the indictments against him, and his appeal is pending in this court.) After adverse rulings on two preliminary motions to dismiss the perjury indictment, Felicia was tried jury-waived on November 30 on the basis of a stipulation and the September 11, 1996, grand jury transcript.

1. *Motion to dismiss based on misconduct.* Summoned to appear before the first grand jury on September 11, 1996, Felicia, still a month shy of her eighteenth birthday, arrived with her mother and a school guidance counselor. While they waited to be called, the assistant district attorney assigned to the case tried to talk with Felicia, explaining that he wanted her to read the police report of her interview with the police on August 27 to see if it was accurate. The exercise never got started due to the guidance counselor's intervention: "Felicia is here because she has to talk to the grand jury. . . . [S]he does not have to talk to the D.A. Felicia, I don't think you should talk to him." The result, as the motion judge found, was that the assistant

district attorney did not know until Felicia gave her testimony to the grand jury whether, under oath, she would stick to the story she gave to the police on August 27.

The motion to dismiss was based on a contrary premise: that the Commonwealth knew or had reason to know that she would lie to protect Melvin, and possibly that she was more deeply involved as an accessory; therefore, the argument goes, the Commonwealth had a duty to warn Felicia that she was herself a target or potential target of the grand jury's inquiry and a corresponding duty to advise her of her Miranda rights. In starting from that premise, the motion relied on language in *Commonwealth* v. *Gilliard*, 36 Mass. App. Ct. 183, 186-189 (1994), expressing a view that was later rejected in *Commonwealth* v. *D'Amour*, 428 Mass. 725, 742-743 (1999).

The motion judge, in any event, did not accept the factual premise of the motion. He believed the assistant district attorney, that Felicia was not on September 11 suspected of being an accessory to the shooting, nor was her testimony intended to "set her up" for a charge of perjury. On September 11 the police only knew, first, that Robinson had asserted that the assailant was Felicia's boyfriend "Melvin" and, second, that Felicia had told an officer that Melvin was with her outside the house at the relevant time. It was not until October 15 that Robinson was able to tell the police that Felicia was with Melvin inside the house at the time Melvin fired the shots and that the two ran away together.

The motion judge acted correctly in denying the motion. Based on his finding as to the sparse state of the Commonwealth's knowledge on September 11, the assistant district attorney was not required to advise Felicia of her right to counsel[2] or of her privilege against self-incrimination. See *Commonwealth* v. *Hawkins*, 26 Mass. App. Ct. 910, 912 (1988); Smith, Criminal Practice and Procedure §§ 795, 800 (2d ed. 1983 & Supp. 2002). Apart from the fact that the Commonwealth on September 11 had not identified Felicia as a target of the investigation, neither Federal nor State law required

---

[2]The right to counsel before the grand jury is not constitutional, see *Commonwealth* v. *Griffin*, 404 Mass. 372, 374 (1989), but statutory (under G. L. c. 277, § 14A, inserted by St. 1977, c. 770).

that she be given a "target" warning. See *Commonwealth* v. *D'Amour*, 428 Mass. at 743.

Moreover, a failure to give required warnings might be a basis for suppression of a witness's testimony in other contexts, but normally it is not a basis for suppression in a subsequent prosecution alleging that the testimony was perjured. See *United States* v. *Mandujano*, 425 U.S. 564, 581-584 (1976) (plurality opinion); *United States* v. *Wong*, 431 U.S. 174, 177-179 (1977). "A grand jury witness has the option to tell the truth or to remain silent. He or she does not have the option to lie. . . . '[T]he prospect of being indicted does not entitle a witness to commit perjury.' " *Commonwealth* v. *D'Amour*, 428 Mass. at 743, quoting from *United States* v. *Washington*, 431 U.S. 181, 189 (1977).

2. *Motion to dismiss indictment for insufficient evidence.* The second motion to dismiss, a "McCarthy motion" (see *Commonwealth* v. *McCarthy*, 385 Mass. 160 [1982]), was predicated on the test for the sufficiency of evidence in a perjury prosecution, adopted in *Commonwealth* v. *Silva*, 401 Mass. 318, 324 (1987), that the evidence offered to corroborate the direct evidence of perjury " 'must be of a direct or clear and compelling character,' *Commonwealth* v. *Coleman*, 20 Mass. App. Ct. [541,] 558 [(1985), *S.C.*, 397 Mass. 1001 (1986)], 'objectively inconsistent with the innocence of the defendant.' *Id.* at 557 & n.21." All that was before the grand jury, the defense counsel argued, was Robinson's testimony that Melvin had shot him in his bedroom and that Felicia had witnessed the shooting and had fled with Melvin, and her own testimony placing herself and Melvin outside the house, hearing shots from within. If that were sufficient to return a perjury indictment, defense counsel argues, any contradiction in testimony between two witnesses would constitute a basis for handing down a perjury indictment. See *Commonwealth* v. *Knowlton*, 50 Mass. App. Ct. 266, 270 (2000).

The motion judge correctly denied the motion to dismiss the indictment. The *McCarthy* decision makes clear that a court reviewing the sufficiency of evidence before a grand jury should not dismiss if the evidence was adequate "to establish the level of probable cause required to support an arrest or search

warrant." *Commonwealth* v. *McCarthy*, 385 Mass. at 162-163 & n.5. See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984) ("at a probable cause hearing the 'examining magistrate should view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury,' *Myers* v. *Commonwealth*, [363 Mass. 843,] 850 [1973], while the evidence before a grand jury will be considered to be legally sufficient if it only meets the less strict probable cause to arrest standard").

The evidence before the grand jury was, in our view, sufficient to meet the probable cause to arrest standard, even if we assume — not implausibly — that that standard required some degree of corroboration of Robinson's testimony. Felicia's grand jury testimony, viewed by the standard of internal contradictions and strong improbabilities, was itself evidence that she was lying. The time sequences left huge gaps. If she and Melvin left the house not long after midnight and returned, as she testified, about one-half hour later, they must have returned more than two hours before the shooting, not just as it was taking place. Felicia's rush to get to a telephone thereafter to call her mother in Alabama involved another unexplained gap, as the call was not received in Alabama for another two and one-half hours. Her denial that Melvin's friend Tony had a telephone was belied by the telephone records showing her call was placed from his phone. Her inability to come up with a consistent story explaining her attempts to get the mother's telephone number in Alabama, her passing up several obvious telephones, and the neighbor's hearing two car doors slam shut all tended to support a strong inference that her entire testimony was a fabrication. Coupled with a readily inferable motive to lie, to obscure the role Melvin (and perhaps she) played in the shooting, the internal weaknesses in Felicia's testimony furnished corroboration of Robinson's story sufficient to warrant an indictment for perjury. The motion to dismiss was properly denied.

3. *The trial.* Although the parties have argued the appeal as if the final issue were the sufficiency of the evidence heretofore discussed to warrant an inference of guilt beyond a reasonable doubt — whether that evidence was, in other words, sufficient under the *Silva* standard, 401 Mass. at 324, for conviction —

the judge's finding of Felicia's guilt (she waived trial by jury on the perjury indictment) had a different evidentiary support. Felicia's trial counsel, reserving for appeal her rights under the two motions to dismiss the perjury indictment and her objection to the introduction of the grand jury transcript, joined the Commonwealth in putting the case before the trial judge on a stipulation of facts together with the September 11 transcript (subject to objections). The stipulation conceded (and established) as facts that at 3:54 A.M. on August 16, Melvin Smith shot Christopher Robinson at least three times, that the shooting took place on the second floor of the Brown house, that Felicia was present at the time "in the immediate area of Melvin Smith," that the phone call from Felicia was made "almost two and a half hours" after the shooting, and that it was made from Tony's apartment. The stipulation in effect put Felicia in the position of conceding that her September 11 testimony to the contrary on all those points was false. The testimony was plainly material to the grand jury's investigation into the circumstances of the shooting. With the evidence in that posture, no meritorious question could arise as to the sufficiency of the evidence for conviction.

An appellate court is not obliged to go beyond the issues raised by the appellant, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); but the panel is reluctant to affirm the conviction on the basis of the stipulation, ignoring an additional issue arising out of the stipulation itself. Compare *Commonwealth* v. *Elder*, 389 Mass. 743, 746 & n.6 (1983); *Commonwealth* v. *Thayer*, 35 Mass. App. Ct. 599, 607 n.14 (1993), *S.C.*, 418 Mass. 130 (1994). See also *McLeod's Case*, 389 Mass. 431, 434 (1983).

The stipulation was tantamount to a guilty plea. "When . . . a defendant stipulates the truth of facts that are conclusive of guilt, [s]he in effect relinquishes the same rights as one who pleads guilty." *Commonwealth* v. *Hill*, 20 Mass. App. Ct. 130, 132 (1985). Such a defendant "is entitled to the same safeguards that surround the acceptance of a guilty plea." *Ibid.* The jury waiver colloquy that Felicia received did not contain critical

elements that must be included in a guilty plea colloquy.[3] See *Commonwealth* v. *Lewis*, 399 Mass. 761, 763-764 (1987); *Commonwealth* v. *Feaster*, 25 Mass. App. Ct. 909 (1987). Like a conviction resting on a guilty plea entered without a colloquy to determine whether the plea is being entered intelligently and voluntarily, the conviction cannot stand on the present record. See *Commonwealth* v. *Orben*, 53 Mass. App. Ct. 700, 706-707 (2002).

The judgment is reversed, and the verdict is set aside.

*So ordered.*

---

[3]In particular, these include waiver of the rights of confrontation and cross-examination and waiver of the privilege against self-incrimination. Compare Smith, *supra* § 1238 (colloquy for guilty plea), with § 1654 (colloquy for waiver of trial by jury). See also *Commonwealth* v. *Babcock*, 25 Mass. App. Ct. 688, 691 (1988) (as to stipulations of evidence).